## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| JASON ZERBE, MARK MASTERSON, and JESSICA ABEL, on behalf of themselves and all others similarly situated, | Case No. 2:24-cv-02026 |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| IMA FINANCIAL GROUP, INC., | |
| Defendant. | |

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs Jason Zerbe, Mark Masterson, and Jessica Abel (collectively "Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant IMA Financial Group, Inc., ("IMA" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.      This class action arises from Defendant's failure to protect highly sensitive data.

2.      Defendant is an integrated financial services company focused on protecting the assets of its clients through insurance and wealth management solutions.[1]

3.      As such, Defendant stores a litany of highly sensitive Personal Identifiable information ("PII") and Private Health Information ("PHI") (collectively with PII, "Private

---

[1] About us, IMA Financial Group, https://imacorp.com/about/ (last visited May 24, 2023).

Information") about its consumers. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4.      IMA's breach differs from typical data breaches because it affects consumers who had no relationship with IMA, never sought one, and never consented to IMA collecting and storing their information.

5.      IMA sourced their information from third parties, stored it on IMA's systems, and assumed a duty to protect it, advertising that IMA takes "steps to ensure that your information is kept safe from unauthorized access. We may use physical, electronic and procedural safeguards to protect your private information." But IMA never implemented the security safeguards needed despite acknowledging their importance.

6.      In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to at least 48,358 consumers' Private Information, including but not limited to Social Security numbers, driver's license information, passport numbers, credit card data, medical records and insurance information.

7.      Due to the obfuscating language of Defendant's breach notice, it is unknown precisely how long the cybercriminals had access to Defendant's network before the breach was discovered.

8.      On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information. In short, Defendant's failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

9.    Plaintiffs are Data Breach victims, each having received a notice of the breach from Defendant ("Breach Notice"). They bring this class action on behalf of themselves, and all others harmed by Defendant's misconduct. Plaintiff Zerbe's Breach Notice is attached as Exhibit A. Plaintiff Masterson's Breach Notice is attached as Exhibit B. Plaintiff Abel's Breach Notice is attached as Exhibit C.

10.    The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this data breach, consumers' private information was exactly that—private. Not anymore. Now, consumers' Private Information is forever exposed and unsecure.

## PARTIES

11.    Plaintiff, Jason Zerbe, is a natural person and citizen of Colorado, where he intends to remain.

12.    Plaintiff, Mark Masterson, is a natural person and citizen of Kansas, where he intends to remain.

13.    Plaintiff, Jessica Abel, is a natural person and citizen of Kansas, where she intends to remain.

14.    Defendant, IMA Financial Group, Inc., is a Kansas company with its principal place of business at 430 E Douglas Ave., Suite 400, Wichita, Kansas 67202.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one Plaintiff and Defendant are citizens of different states. And there are over 100 putative Class members.

16.     This Court has personal jurisdiction over Defendant because it is headquartered in Kansas, regularly conducts business in Kansas, and has sufficient minimum contacts in Kansas.

17.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

***Defendant Collected and Stored the Private Information of Plaintiffs and the Class***

18.     Founded in 1973, IMA is a financial services company that represents itself as a "powerhouse in the central United States", with multiple offices in Colorado, Texas, and Kansas, and with clients "in all 50 states and around the world."[2]  Defendant provides its financial services to small businesses, families, and individuals. Defendant generates approximately $1.5 billion in annual revenue.[3]

19.     As part of its business, Defendant receives and maintains the Private Information of thousands of consumers (such as, *inter alia*, its clients' consumers and employees) In collecting and maintaining the Private Information, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class members themselves took reasonable steps to secure their Private Information.

20.     Defendant advertises that security is a top concern and that the company is "responsive and responsible" to its consumers' needs[4]:

---

[2] Locations, IMA Financial Group, https://imacorp.com/business/about-us/locations/ (last visited May 24, 2023).
[3] IMA Financial Group Revenue, IMA, https://www.zippia.com/ima-financial-group-careers-41183/revenue/ (last visited December 27, 2023).
[4] Homepage, IMA Financial Group, https://imaselect.com/about-us/ (last visited May 24, 2023).



21.     Indeed, so confident was IMA in its own cybersecurity ability and services, that it advertised to solicited potential clients through warnings like "it is not a matter of if, but when a cyber event will occur":

> It is not a matter of
> if, but when a cyber
> event will occur

22.     IMA further advertises that it was able to "leverage[] a proprietary proactive risk management playbook, specifically designed to address the risks faced by health and human services companies to minimize the risk of a data breach or hack":

23.     In its privacy policy, IMA promises that it does not disclose any nonpublic information of its consumers to non-affiliated third parties by law.[5]

24.     Indeed, IMA claims that it takes "reasonable steps to ensure that your information is kept safe from unauthorized access", and that Defendant utilizes "physical, electronic, and

---

[5] Privacy Policy Notice, IMA Financial Group, https://imacorp.com/privacy/ (last visited May 24, 2023).

procedural safeguards to protect your private information and to assist us in preventing unauthorized access to that information."[6]



25.    Yet, upon information and belief, IMA did not implement those security safeguards as advertised, nor were they reasonably sufficient to protect the highly sensitive data IMA collected.

26.    As Plaintiffs allege above, as part of its business, IMA collects data on individuals who have no relationship with it, do not want one, and have never consented to its services.

27.    Under state and federal law, businesses like Defendant have duties to protect consumers' Private Information and to notify them about breaches.

***Defendant's Data Breach***

28.    Plaintiff Zerbe is unsure how IMA got his information but assumes that his employer provided IMA with his Private Information.

---

[6] *Id.*

29.    Plaintiff Masterson is unsure how IMA got his information but assumes that his employer provided IMA with his Private Information.

30.    Plaintiff Abel is unsure how IMA got her information but assumes that her employer provided IMA with her Private Information.

31.    On information and belief, IMA collects and maintains Private Information belonging to its clients' current and former employees in its computer systems.

32.    In collecting and maintaining Private Information, IMA implicitly agrees it will safeguard the data using reasonable means according to its internal policies and federal law.

33.    According to its Breach Notice, IMA claims to have "learned of unusual activity involving certain systems in our network" on October 19, 2022. An internal investigation revealed that "IMA data may have been accessed or acquired without authorization." Ex. A.

34.    In other words, Defendant's investigation revealed that its network had been hacked by cybercriminals and that Defendant's inadequate cyber and data security systems and measures allowed those responsible for the cyberattack to access and actually steal files containing a treasure trove of thousands of IMA's consumers' personal and highly sensitive Private Information.

35.    Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class's Private Information for theft and sale on the dark web.

36.    Upon information and belief, the notorious Black Basta ransomware gang was responsible for the cyberattack. Known as one of the most notorious and active ransomware actors that raked in at least $100 million in ransom payment through just 90 victims, Black Basta has perpetrated multiple high-profile breaches in the last year alone. [7] IMA knew or should have known of the tactics that groups like Black Basta employ.

---

[7] Black Basta ransomware, Bleeping Computer, https://www.bleepingcomputer.com/news/security/black-basta-ransomware-made-over-100-million-from-extortion/ (last accessed December 27, 2023).

37.    With the Sensitive Information secured and stolen by Black Basta, the hackers then purportedly issued a ransom demand to IMA. However, IMA has provided no public information on the ransom demand or payment. An example of Black Basta's standard demand ransom page is displayed below:





38.    On information or belief, Black Basta releases all stolen information onto the dark web for access, sale, and download following the deadline of the ransom demand to Defendants.[8]

39.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiffs' Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gain access into other secure accounts such as financial accounts.[9] On information and belief, Plaintiffs' financial accounts were also compromised as a result of the Data Breach.

40.    Despite Plaintiffs' and the Class' most sensitive information being available for viewing and sale on the dark web, Defendant did not begin notifying the class until April 19, 2023—a full *six months* after the Data Breach occurred.

41.    Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

42.    And when Defendant did notify Plaintiffs and the Class of the Data Breach, Defendant's Breach Notice obfuscated the nature of the breach and the threat it posed—refusing to tell its victims how many people were impacted, how the breach happened, the date the breach happened, or why it took the Defendant over six months to begin notifying some of its victims that hackers had gained access to highly sensitive Private Information.

43.    Defendant failed in its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data

---

[8] New Black Basta Ransomware Attack Brings Down 50 Organizations Globally, Indusface, https://www.indusface.com/blog/new-black-basta-ransomware-attack-brings-down-50-organizations-globally/#:~:text=The%20Black%20Basta%20is%20a,release%20of%20decrypted%20stolen%20data. (last visited January 3, 2024)

[9] *See* What is Data Theft and How to Prevent it, Kaspersky, https://usa.kaspersky.com/resource-center/threats/data-theft (last visited May 24, 2023); *see also* https://nordvpn.com/blog/data-theft/; https://www.csoonline.com/article/570759/how-cybercriminals-turn-harmless-stolen-or-leaked-data-into-dollars.html

Breach and stop cybercriminals from accessing the Private Information. And thus, Defendant caused widespread injury and monetary damages.

44.    Since the breach, Defendant claims it has "taking steps to prevent a similar event from occurring in the future." Ex. A. But this is too little too late. Simply put, these measures— which Defendant now recognizes as necessary—should have been implemented *before* the Data Breach.

45.    In response to the Data Breach, Defendant recognized the actual imminent harm and injury that flowed from the Data Breach so it encouraged breach victims to:

a.    "remain vigilant by reviewing your account statements and credit reports closely [;]

b.    Promptly report any fraudulent activity or suspected incidence of identity theft to law enforcement authorities[;]

c.    put a security freeze on your credit file for up to one year [;] and

d.    obtain information from the consumer reporting agencies, the FTC, or from your respective state Attorney General about fraud alerts, security freezes, and steps you can take toward preventing identity theft." Ex. A

46.    Had Defendant notified Plaintiffs and the Class of the Data Breach in a timely manner, Plaintiffs and the Class would have taken these aforementioned actions, as suggested and acknowledged by Defendant to prevent the actual and imminent harm flowing from the Data Breach, to promptly protect themselves from identity theft and fraud.

47.    IMA further recognized through its Breach Notice, its duty to implement reasonable cybersecurity safeguards and/or policies to protect its consumers' Private Information, insisting that "we take your trust in us and this matter very seriously" and pleading for consumers to "please

accept our sincere apologies for any worry or inconvenience" stemming from the Data Breach. Ex. A.

48.     On information and belief, Defendant failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

49.     On information and belief, IMA has offered several months of complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves Private Information that cannot be changed, such as Social Security numbers. Further, the breach exposed consumers' nonpublic, highly private information, a disturbing harm in and of itself.

50.     Even with complimentary credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' Private Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

51.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

52.     On information and belief, IMA failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over consumers' Private Information. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing Private Information. Further, the Breach Notice makes clear that IMA cannot, or will not, determine the full scope of the Data Breach.

53.     Because of Defendant's Data Breach, the sensitive Private Information of Plaintiffs and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class members.

***Plaintiff Zerbe's Experiences and Injuries***

54.     Mr. Zerbe received the IMA breach notice in May 2023. He is unsure why Defendant is in possession of his Private Information, though he believes it did so through his employer.

55.     Regardless, Defendant obtained and continues to maintain Plaintiff's Private Information, including his name, date of birth, Social Security number, claim number, policy number, and member ID number. IMA has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

56.     Defendant exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

57.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice and privacy event web page.

58.     Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

59.     Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

60.    Plaintiff suffered actual injury from the exposure and theft of his Private Information —which violates his rights to privacy.

61.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

62.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's Private Information right in the hands of criminals.

63.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

64.    Today, Plaintiff has a continuing interest in ensuring that his Private Information —which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### *Plaintiff Masterson's Experiences and Injuries*

65.    Mr. Masterson received the IMA breach notice in May 2023. He is unsure why Defendant is in possession of his Private Information, though he believes it did so as a benefits administrator of his former employer.

66.    Regardless, Defendant obtained and continues to maintain Plaintiff's Private Information including his name, Social Security number, policy number and member ID. IMA has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

67.    Defendant exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

68.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice and privacy event web page.

69.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

70.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

71.    Plaintiff suffered actual injury from the exposure and theft of his Private Information —which violates his rights to privacy.

72.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property— property that Defendant was required to adequately protect.

73.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiffs' Private Information right in the hands of criminals.

74.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

75.    Indeed, following the Data Breach, on or around September 5, 2023, Plaintiff Masterson detected two unauthorized charges on explanations of benefits for both his Medicare account and his account with a supplemental provider, Mutual of Omaha. Both charges were for $1,990.00, totaling $3,980.00. The charges were for medical services which he did not order,

receive, recognize, nor authorize. Importantly, the medical services were dated to have taken place on May 8, 2023, and June 7, 2023 – just months after the Data Breach – suggesting his Private Information, including Social Security number, is in the hands of cybercriminals and being fraudulently misused as a result of the Data Breach.

76.    Soon thereafter, on September 14, 2023, Plaintiff also received a call from what a medical company he did not recognize that recited his Social Security number and attempted to convince him to sign up for a new "Medicare benefit" for which the mysterious caller stated Plaintiff Masterson qualified. After quickly hanging up the phone, Plaintiff Masterson became suspicious and reported the call to Medicare, Mutual of Omaha, and his doctor's office.

77.    These calls, known as 'phishing', is a common tactic where cybercriminals will utilize Private Information they find on an individual on the dark web and attempt to solicit even further personal information by posing as legitimate entities with 'offers' for their victim.[10] On information and belief, the phishing calls Plaintiff experienced is a result of Defendant's exposure of his Private Information for theft and sale on the dark web and a consequence of the Data Breach.

78.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Masterson's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gain access into other secure accounts.[11] On information and belief, Plaintiff's insurance information was also compromised as a result of the Data Breach.

---

[10] *See* How do Hackers Steal Passwords, Keeper, https://www.keepersecurity.com/blog/2023/06/13/how-do-hackers-steal-passwords/ (last visited January 3, 2024); *see also* https://safecomputing.umich.edu/protect-yourself/phishing-scams/common-scams/phone-scams ; https://business.bofa.com/en-us/content/what-is-vishing.html

[11] *See* What is Data Theft and How to Prevent it, Kaspersky, https://usa.kaspersky.com/resource-center/threats/data-theft (last    visited    May    24,    2023);    *see    also    *https://nordvpn.com/blog/data-theft/; https://www.csoonline.com/article/570759/how-cybercriminals-turn-harmless-stolen-or-leaked-data-into-dollars.html

79.     To Plaintiff Masterson's knowledge, he has not been involved in any other data breach that involved his Social Security number or insurance information.

80.     Today, Plaintiff has a continuing interest in ensuring that his Private Information —which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### Plaintiff Abel's Experiences and Injuries

81.     Ms. Abel received the IMA breach notice in late April of 2023. She is unsure why Defendant is in possession of her Private Information, though she believes it did so through her current employer as her employer's insurance broker.

82.     Regardless, Defendant obtained and continues to maintain Plaintiff's Private Information, including her name, date of birth, and driver's license number.  IMA has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

83.     Defendant exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

84.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring these and other accounts to attempt to mitigate and protect herself from additional identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice and privacy event web page.

85.     Plaintiff fears for her personal financial security and worries about her information having been exposed in the Data Breach.

86.     Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond

allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses, especially in consideration of the fraud that she has already experienced.

87.     Plaintiff suffered actual injury from the exposure and theft of her Private Information —which violates her rights to privacy.

88.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property— property that Defendant was required to adequately protect.

89.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiffs' Private Information right in the hands of criminals.

90.     Indeed, following the Breach, on or around January and June of 2023, Plaintiff experienced multiple instances of fraud that included the unauthorized use of her credit and debit cards at out-of-state Subway and Qdoba restaurants, as well as unauthorized access to (and use of) her Amazon Prime account. These instances of fraud suggest that Plaintiff's Private Information is now in the hands of cybercriminals and being used to carry out fraudulent schemes against her.

91.     Once an individual's Private Information is for sale and access on the dark web, as Plaintiff's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gain access into other secure accounts, such as financial accounts.[12] On information and belief, Plaintiff's financial account was compromised as a result of the Data

---

[12] *See* What is Data Theft and How to Prevent it, Kaspersky, https://usa.kaspersky.com/resource-center/threats/data-theft (last visited May 24, 2023); *see also* https://nordvpn.com/blog/data-theft/; https://www.csoonline.com/article/570759/how-cybercriminals-turn-harmless-stolen-or-leaked-data-into-dollars.html

Breach. To Plaintiff's knowledge, she has never been a victim of a data breach that involved her Driver's License number.

92.     Because of the Data Breach, Plaintiff anticipates continuing to spend considerable amounts of time and money to try and mitigate her injuries.

93.     Today, Plaintiff has a continuing interest in ensuring that her Private Information —which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

94.     Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

      a.    loss of the opportunity to control how their Private Information is used;

      b.    diminution in value of their Private Information;

      c.    compromise and continuing publication of their Private Information;

      d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

      e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

      f.    delay in receipt of tax refund monies;

      g.    unauthorized use of their stolen Private Information; and

h.    continued risk to their Private Information —which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

95.    Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.

96.    The value of Plaintiffs' and Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

97.    One way that criminals profit from stolen Private Information is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen Private Information, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

98.    The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

99.    In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact,

including this Court or a jury, to find that Plaintiffs' and other Class members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

100.    For example, a stolen Social Security Number can be used to perpetrate credit card fraud by combining that information with other pieces of personal information obtained via data breaches. Thus, just because an individual's credit card number was not a piece of information stolen in a data breach does not mean that credit card fraud or other financial fraud cannot occur-in fact it simply makes it more likely that such fraud will occur.[13]

101.    Additionally, the federal government has warned Medicare participants to be vigilant against medical identity theft, which it states can occur "when someone steals or uses your personal information (like your name, Social Security Number, or Medicare Number) to submit fraudulent claims to Medicare and other health insurers without your permission."[14]

102.    Defendant disclosed the Private Information of Plaintiffs and Class members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the Private Information of Plaintiffs and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen Private Information .

---

[13] *See, e.g.* https://www.aura.com/learn/what-can-someone-do-with-your-social-security-number#:~:text=Someone%20with%20your%20SSN%20could,breaches%20on%20the%20Dark%20Web (last accessed Jan. 4, 2024).
[14] *See* https://www.medicare.gov/Pubs/pdf/10111-Protecting-Yourself-and-Medicare.pdf (last visited Jan. 4, 2024).

103.    The Dark Web Price Index of 2022, published by PrivacyAffairs[15] shows how valuable just email addresses alone can be, even when not associated with a financial account:

| Email Database Dumps | Avg. Price USD (2022) |
| --- | --- |
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

104.    Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails.  If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

105.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII alone can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

106.    A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user.  In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

107.    Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiffs' PII impairs their ability to participate in the economic marketplace.

---

[15] *See* https://www.privacyaffairs.com/dark-web-price-index-2022/ (last visited on May 1, 2023).

108.    A study by the Identity Theft Resource Center[16] shows the multitude of harms caused by fraudulent use of PII:



109.    PHI is also especially valuable to identity thieves.  As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[17]

110.    Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

111.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

---

[16] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited May 1, 2023).
[17] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on May 2, 2023).

112.    Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[18]

113.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the Private Information far and wide.

114.    Defendant's failure to promptly and properly notify Plaintiffs and Class members of the Data Breach exacerbated Plaintiffs' and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

115.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

116.    In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[19]

117.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller

---

[18] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on May 2, 2023).

[19]    *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[20]

118.    Defendant acknowledges on its own website that its client's industries, including health and human services, were "one of the most vulnerable industries because of the amount of both PII and PHI each entity stores":

### EXPOSURE IN THE HEALTH + HUMAN SERVICES INDUSTRY

+ Health and Human Services is one of the most vulnerable industries because of the amount of both PII (Personally Identifiable Information) and PHI (Personal Health Information) each entity stores

+ The increase of telehealth and telemedicine adds to the cyber risk

### RANSOMWARE ATTACKS HAVE BECOME MORE PREVALENT

+ According to the Department of Health and Human Services, in 2019 there were more than 500 data breaches in the Healthcare Industry, an increase of 196% from 2018, representing 41 million patient records

+ IMA's Cyber Risk practice understands the unique risks of the Health and Human Services Industry and tailors the coverage specific to each client's needs

119.    Further, the FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[21] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

---

[20] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[21] *FTC Information Injury Workshop, BE and BCP Staff Perspective*, Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on May 1, 2023).

120.    Defendant itself acknowledges the harms of these informational injuries that result from a data breach:



121.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

122.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

123.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[22]  The FTC declared that, *inter alia*, businesses must:

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

---

[22] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

     c.     encrypt information stored on computer networks;

     d.     understand their network's vulnerabilities; and

     e.     implement policies to correct security problems.

124.     The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

125.     Furthermore, the FTC explains that companies must:

     a.     not maintain information longer than is needed to authorize a transaction;

     b.     limit access to sensitive data;

     c.     require complex passwords to be used on networks;

     d.     use industry-tested methods for security;

     e.     monitor for suspicious activity on the network; and

     f.     verify that third-party service providers use reasonable security measures.

126.     The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

127.     In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to consumers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***IMA Failed to Comply with HIPAA***

128.    Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

129.    IMA's Data Breach resulted from a combination of insufficiencies that indicate its failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Defendant's Data Breach that it either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

130.    Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

131.    45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

132.    45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

133.    Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

134.    Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

135.    Based upon Defendant's Notice to Plaintiffs and Class Members, IMA reasonably believes that Plaintiffs' and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

136.    Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

137.    IMA reasonably believes that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

138.    Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

139.    Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

140.    IMA reasonably believes that Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

141.    It is reasonable to infer that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

142.    It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

143.    After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

144.    In addition, IMA's Data Breach could have been prevented if it had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its customers.

145.    IMA's data security failures also include, but are not limited to:

    a.    Failing to maintain an adequate data security system to prevent data loss;

    b.    Failing to mitigate the risks of a data breach and loss of data;

    c.    Failing to ensure the confidentiality and integrity of electronic protected health information Defendant creates, receives, maintains, and transmits, in violation of 45 CFR 164.306(a)(1);

    d.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.  Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.  Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

k.  Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

146.  The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414 also required Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***" (emphasis added).

147.  Because Defendant has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure

Defendant's approach to information security is adequate and appropriate going forward. Defendant still maintains the PHI and other highly sensitive PII of its clients' consumers, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

***Defendant Failed to Follow Industry Standards***

148.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

149.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

150.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

151.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

152.     Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose Private Information was compromised in the Data Breach discovered by IMA Financial Group in October 2022, including all those who received notice of the Data Breach.

153.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

154.     Plaintiffs reserve the right to amend the class definition.

155.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

156.     <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

157.     <u>Numerosity</u>. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes tens of thousands of members.

158. <u>Typicality</u>. Plaintiffs' claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

159. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the proposed Class's common interests. their interests do not conflict with Class members' interests. And Plaintiffs have retained counsel—including lead counsel—that are experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

160. <u>Commonality and Predominance</u>. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

      a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Private Information ;

      b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

      c.    if Defendant were negligent in maintaining, protecting, and securing Private Information;

      d.    if Defendant breached contract promises to safeguard Plaintiffs' and the Class's Private Information ;

      e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

      f.    if Defendant's Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiffs and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

161.    Superiority. A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

162.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

163.    Plaintiffs and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

164.    Defendant owed a duty of care to Plaintiffs and Class members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry

standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

165.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if their Private Information was wrongfully disclosed.

166.    Defendant owed these duties to Plaintiffs and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class members' Private Information.

167.    Defendant owed—to Plaintiffs and Class members—at least the following duties to:

   a.    exercise reasonable care in handling and using the Private Information in its care and custody;

   b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

   c.    promptly detect attempts at unauthorized access;

   d.    notify Plaintiffs and Class members within a reasonable timeframe of any breach to the security of their Private Information .

168.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class members to take appropriate measures to protect their

Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

169.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

170.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

171.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

172.    The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Private Information —whether by malware or otherwise.

173.    Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and Class members and the importance of exercising reasonable care in handling it.

174.    Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

175.    Defendant breached these duties as evidenced by the Data Breach.

176.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class members' Private Information by:

      a.    disclosing and providing access to this information to third parties and

      b.    failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

177.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the Private Information of Plaintiffs and Class members which actually and proximately caused the Data Breach and Plaintiffs' and Class members' injury.

178.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class members' injuries-in-fact.

179.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

180.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

181.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information , lost benefit of their

bargain, lost value of their Private Information , and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

<u>SECOND CAUSE OF ACTION</u>
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

182.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

183.    Pursuant to Section 5 of the FTCA, Defendant had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

184.    Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

185.    Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

186.    Defendant breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

187.    Specifically, Defendant breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper

segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

188.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, and the industry-standard cybersecurity measures also set forth above, form part of the basis of IMA's duty in this regard.

189.    Defendant also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

190.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to IMA's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

191.    Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and IMA's failure to comply with both constitutes negligence *per se*.

192.    Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to IMA's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

193.    As a direct and proximate result of IMA's negligence *per se*, Plaintiffs and the Class have suffered, and/or are at a substantial and imminent risk of suffering, injuries and damages

arising from the unauthorized access of their Private Information, including but not limited to damages from the actual misuse of their Private Information and the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

194. As a direct and proximate result of IMA's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

195. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**THIRD CAUSE OF ACTION**
**Negligence *per se***
**For Violation of Kansas' Chapter 50 Unfair Trade and Consumer Protection, Article 7a**
**Protection of Consumer Information, K.S.A. 50–7a01, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

196. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

197. Defendant is a business entity that maintains, stores, or manages computerized data that includes personal information as defined by K.S.A. 50–7a01(f).

198. Plaintiffs' and members of the Class's Private Information includes "personal information" as defined by K.S.A. 50–7a01(g).

199. Defendant was aware of a breach of its computer system that it believed or reasonably should have believed had caused or would cause loss or injury to residents of Kansas.

200. Defendant had an obligation to disclose the Data Breach to Plaintiffs and members of the Class "in the most expedient time possible and without unreasonable delay," as mandated by K.S.A. 50–7a02(a).

201.    Defendant's failure to disclose the Data Breach in a timely manner as required by K.S.A. 50–7a02(a) constitutes negligence *per se*.

202.    As a direct and proximate cause of Defendant's negligence in failing to comply with by K.S.A. 50–7a02, Plaintiffs and members of the Class sustained actual losses and damages as described herein.

## FOURTH CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

203.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

204.    IMA provided wealth management and insurance services to Plaintiffs and Class Members through Plaintiffs' and Class Members' employment with Defendant's clients. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiffs and Class Members entrusting their Private Information to Defendant's care in exchange for these services.

205.    Through Defendant's offering of services, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with IMA's policies, practices, and applicable law.

206.    As consideration, Plaintiffs and Class Members turned over valuable (and monetizable) Private Information to IMA in exchange for IMA's safekeeping of such information. Accordingly, Plaintiffs and Class Members bargained with IMA to securely maintain and store their Private Information.

207.    IMA accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

208.     In delivering their Private Information to IMA, Plaintiffs and Class Members intended and understood that IMA would adequately safeguard the Private Information as part of the wealth management and insurance services Defendant offered.

209.     Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

210.     Plaintiffs and Class Members would not have entrusted their Private Information to IMA in the absence of such an implied contract.

211.     Had IMA disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices in place that were sufficient to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to IMA.

212.     IMA recognized that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of its bargain with Plaintiffs and the Class.

213.     IMA violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information.

214.     Plaintiffs and Class Members have been damaged by IMA's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## FIFTH CAUSE OF ACTION
### Breach of Third-Party Beneficiary Contract
### (On Behalf of Plaintiffs and the Class)

215.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

216.    Upon information and belief, Defendant entered into virtually identical contracts with its clients, including Plaintiffs' current and former employers, to provide wealth management and insurance services, which included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it under the terms of said contracts.

217.    Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties, and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

218.    Defendant knew that if it was to breach these contracts with its clients, Plaintiffs and the Class would be harmed.

219.    Defendant breached its contracts with its clients and, as a result, Plaintiffs and Class Members were affected by the Data Breach in the ways enumerated herein when Defendant failed to use reasonable data security measures that could have prevented the Data Breach.

220.    As foreseen, Plaintiffs and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

221.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

222.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

223.    This claim is pleaded in the alternative to the breach of implied contract and breach of third-party beneficiary contract claims.

224.    Plaintiffs and Class members conferred a benefit upon Defendant. After all, Defendant benefitted from using their Private Information to provide financial services.

225.    Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class members. And Defendant benefited from receiving Plaintiffs' and Class members' Private Information, as this was used to provide financial services.

226.    Plaintiffs and Class members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

227.    Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class members' Private Information.

228.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

229.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class members' payment because Defendant failed to adequately protect their Private Information.

230.    Plaintiffs and Class members have no adequate remedy at law.

231.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**SEVENTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

232.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

233.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

234.    Defendant owed a duty to Plaintiffs and Class Member to keep their Private Information confidential.

235.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

236.    Defendant's reckless and negligent failure to protect Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

237.    Defendant's failure to protect Plaintiffs' and Class Members' Private Information acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

238.    Defendant knowingly did not notify Plaintiffs and Class Members in a timely fashion about the Data Breach.

239.    Because Defendant failed to properly safeguard Plaintiffs' and Class Members' Private Information, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

240.    As a proximate result of Defendant's acts and omissions, the Private Information of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

241.    As a proximate result of Defendant's acts and omissions, the Private Information of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

242.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant with their inadequate cybersecurity system and policies.

243.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiffs and the Class.

244.    Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information.

245.    Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## EIGHTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiffs and the Class)

246.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

247.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.,* this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

248.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

249.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

      b.    Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

      c.    Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

      d.    Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class members.

250.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

251.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

252.    And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs' and Class members' injuries.

253.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

254.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class members respectfully request judgment against Defendant and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.    Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.      Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F.      Awarding attorneys' fees and costs, as allowed by law;

G.      Awarding prejudgment and post-judgment interest, as provided by law;

H.      Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.      Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Dated: January 18, 2024                    Respectfully submitted,

                               By: */s/  Jeremy M. Suhr*

**BOULWARE LAW LLC**
Brandon J.B. Boulware, KS # 25840
Jeremy M. Suhr, KS # 24025
1600 Genessee Street, Suite 416
Kansas City, MO 64102
Tel: (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

**SIRI & GLIMSTAD LLP**
Mason A. Barney (pro hac vice to be filed)
Tyler J. Bean (pro hac vice to be filed)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
mbarney@sirillp.com
tbean@sirillp.com

Raina C. Borrelli
**TURKE & STRAUSSLLP**
613 Williamson St., Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
raina@turkestrauss.com

*Attorneys for Plaintiffs and Proposed Class*